REVISED MARCH 29, 2007
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 05-20791

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 7, 2007

**Charles R. Fulbruge III**

**Clerk**

MARILYN MITCHELL; KEVIN BALE;
SUSAN BOORSTEIN,

Plaintiffs-Appellants

v.

CONTINENTAL AIRLINES, INC.;
INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS,

Defendants-Appellees

_____
Appeal from the United States District Court
for the Southern District of Texas
_____

Before KING, WIENER, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs-Appellants Marilyn Mitchell, Kevin Bale, and Susan Boorstein appeal the district court's grant of summary judgment, dismissing without prejudice their petition to vacate an arbitration award under the Railway Labor Act ("RLA").[1] For the following reasons, we affirm the district court, concluding that Boorstein failed to exhaust her contractually-created procedural remedies and that Mitchell and Bale lack standing to bring a petition under the RLA.

---

[1] 45 U.S.C. §§ 151 et seq.

# I. FACTS AND PROCEEDINGS

## A. Background

The plaintiffs are flight attendants for Defendant-Appellee Continental Airlines, Inc. ("Continental"). As such, their employment is governed by a collective bargaining agreement ("CBA") between Continental and Defendant-Appellee International Association of Machinists and Aerospace Workers ("IAM"). The CBA provides a system of procedures for the resolution of employment grievances, ultimately requiring that unresolved grievances be resolved by final and binding arbitration before a Systems Board of Adjustment ("the Board"), as is permitted by the RLA. In addition, the CBA specifies that the IAM shall serve as the exclusive bargaining representative for all flight attendants.

Under the CBA, Continental's flight attendants accrue various types of seniority, each of which is classified as either competitive or non-competitive. Continental is required to post competitive seniority dates biennially. Flight attendants have thirty days after each such posting to challenge the accuracy. Competitive seniority is not at issue in this case; non-competitive seniority is, though.

Continental is not required to post non-competitive seniority dates for its flight attendants. Non-competitive rankings include pay seniority, vacation seniority, and jump-seat

and pass-riding seniority.  Instead of posting lists of non-competitive seniority periodically, they are communicated in other, more discrete ways.

B.  <u>Boorstein</u>

Boorstein had been employed as a Continental flight attendant since November 1968, when in 1996, she learned that her jump-seat seniority date had been changed from her date of hire to a subsequent date in 1971.  She also learned that her company service date had been unfavorably changed when, on her thirtieth anniversary with Continental, she received a cake of the type customarily given to flight attendants with only twenty years of service.  Boorstein alleges that, after she inquired into the unfavorable adjustments, her seniority status was again adjusted adversely.  Boorstein never filed a grievance against Continental and never sought to resolve her dispute through arbitration before the Board.

C.  <u>Mitchell</u>

Mitchell began her employment with Continental in January 1969 and began flying the next month.  In 1996, Mitchell's pass-riding seniority date was retroactively adjusted without her knowledge as a result of company-offered leave that she had taken

years earlier.[2]  The next year, Mitchell also discovered that her vacation seniority date was different and less advantageous than previously indicated.  Throughout 1997 and 1998, Mitchell repeatedly contacted and questioned Continental personnel regarding the accuracy of her seniority dates.  She alleges that her questioning led to even greater unfavorable adjustments.

Unable to resolve her inquiries satisfactorily, Mitchell contacted IAM in 1999.  After prolonged discussions, IAM eventually permitted Mitchell to file a grievance against Continental, in which she contended that her non-competitive seniority dates had been subjected to unfair, adverse adjustments.  That was in May 2000.  Her grievance was denied following a step-one and a step-two hearing.

D.  Bale

Bale joined Continental as a flight attendant in July 1987.  In 1997, he discovered that his vacation seniority date was less advantageous than his records indicated it should have been.

---

[2] Company-offered leave is optional leave offered by Continental to its flight attendants.  It is offered to those attendants with higher seniority in lieu of leave being forced on junior flight attendants (i.e., furlough status), thereby alleviating the effect of overstaffing and base closings.  This is advantageous to Continental, because its payroll expense is reduced by having lower paid flight attendants on duty, as Continental does not have to pay its senior flight attendants who are on company-offered leave and does not have to pay furlough pay to junior flight attendants who would otherwise be on furlough status.

4

Bale periodically inquired into the discrepancy between 1998 and 2000. He was eventually informed that his vacation seniority date had been adjusted for company-offered leaves that he had taken between 1991 and 1995.

In August 2000, Bale filed a grievance, complaining of unfair and unequal adjustment of seniority. In June 2001, Bale filed a second grievance, complaining that Continental violated the CBA by including managerial employees at the level of director or above in the System Seniority List. Both of these grievances were denied following a step-one and a step-two hearing.

E.    Involvement of IAM

A stamped, and then signed and dated notice appears in the upper, right-hand corner of both Mitchell's and Bales' grievances, in which each attendant acknowledged: "I hereby authorize the International Association of Machinists, with full power of attorney, to represent me in all stages of the Grievance Procedure in the presenting and settling of this grievance." After Mitchell's and Bale's grievances were denied by Continental, they were referred to arbitration before the Board, which consisted of one IAM representative, one Continental representative, and one neutral chairperson. As the IAM had previously learned that several other flight attendants' non-

competitive seniority dates had been unfavorably adjusted without their knowledge, it presented with those of Mitchell and Bale the grievances of four similarly-situated flight attendants in a two-day arbitration hearing before the Board in February 2002.

Prior to this hearing being held, Mitchell and Bale had received numerous notices of the hearing dates and locations, the hearing date having been postponed and rescheduled numerous times. In addition, both Mitchell and Bale met with IAM representatives in 2001, and Mitchell attended a second preparatory meeting in February 2002.

When the hearing was finally convened in February 2002, Mitchell participated in person and Bale participated by telephone. Both Mitchell and Bale allege that, immediately before the hearing, IAM informed them that it would not be representing them, so they would have to represent themselves. Both claim that they thus were "ambushed" into putting on their own, admittedly deficient, pro se case.

In May 2002, the Board rendered its arbitral decision and award ("the Award"). The Board first decided that it lacked jurisdiction over matters arising before the date that the CBA was formed, April 1, 2000. It then concluded that Continental had failed to maintain "a careful record of when an individual returned to work from a leave of absence for purposes of his or

6

her seniority" and that "[a]djustments [were] made for periods of inactivity taken by some individuals when they returned to work, but not for others." After acknowledging Continental's failure to maintain careful records and declaring that it was unable to "examine all of the individual employment records of the [more than 9,000] flight attendants employed by Continental," the Board prescribed the following procedure to be used by flight attendants retrospectively challenging their seniority dates and for Continental's use in making future adjustments:

> [F]or retroactive adjustments that occurred within the last two years, flight attendants may protest such adjustments in their seniority dates which occurred more than a year after the event which triggered the adjustment. They may do so within 30 days of the date on which this award is rendered, and the parties shall have the joint obligation of informing all flight attendants of this decision. . . . For the future, the company shall have a period of one year from the date on which they first were notified by the Company . . . to file a protest.

In the Award, the Board also (1) decided that its ruling would apply to Bale's grievance and provided the IAM and Continental an opportunity to resolve his grievance amicably based on the rules set forth in the Award; (2) denied as untimely those grievances relating to individuals holding managerial positions at the director level and higher as untimely; and (3) denied Mitchell's grievances "because the adjustments were made contemporaneously and in order to retain seniority one must be on

7

the list of Company employees and to accrue seniority one must be in the active service of the Company and be receiving pay for such service." Finally, the Board retained jurisdiction over "all disputes arising based upon this decision including questions regarding remedy."

Continental and IAM then issued a joint notice to all flight attendants, informing them of the existence of the Award, its terms and conditions, and the deadline for filing claims pursuant to the Award. In October of that year, after negotiations between Bale and Continental proved unsuccessful, the Board issued a second arbitral award, finding that the seniority adjustments of which Bale complained "were actually made in September 1998, outside the timeframe for claims that can be submitted under the [Award]." The Board, therefore, denied Bale's grievance.

In May 2004, the plaintiffs filed a petition for review of the Award in the Southern District of Florida, requesting that the district court (1) enjoin Continental from implementing the Award, (2) vacate the Award, and (3) remand the matter to the Board. The plaintiffs contended that the Award failed to comply with and conform to the requirements of the RLA and that it violated their constitutional right to due process. In August 2004, the Southern District of Florida transferred the action to

8

the District Court for the Southern District of Texas, from which this appeal is taken.

In August 2005, the district court, treating the plaintiffs' petition for review and defendants' opposition to it as cross-motions for summary judgment, denied the plaintiffs' petition for review and entered judgment in favor of Continental and IAM, concluding that the plaintiffs' failure to allege a breach of IAM's duty of fair representation left them without standing. In addition, the district court dismissed the plaintiffs' constitutional due process claims, ruling that the plaintiffs had failed to state a claim for which relief could be granted. The plaintiffs timely filed a notice of appeal.

## II. LAW AND ANALYSIS

A. Standard of Review

We review a grant of summary judgment de novo, applying the same standard as the district court.[3] The RLA regulates labor disputes between airline carriers and their employees by establishing mandatory procedures for the resolution of disputes, both major and minor, to prevent the commercial interruptions that might otherwise result.[4]

---

[3] Riverwood Int'l Corp. v. Employers Ins. of Wausau, 420 F.3d 378, 382 (5th Cir. 2005).

[4] Cont'l Airlines, Inc. v. Int'l Bhd. Of Teamsters, 391 F.3d 613, 616-17 (5th Cir. 2004).

The RLA distinguishes disputes by whether they seek to create contractual rights or to enforce them.[5]  A major dispute concerns the formation of a CBA, which arises when a CBA is not in place or when a party seeks to change the terms of a CBA.[6]  A minor dispute concerns grievances or the interpretation or application of agreements covering rates of pay, rules, or working conditions.[7]  Pursuant to the RLA, minor disputes must be resolved through a compulsory, binding arbitration procedure before an adjustment board.  These arbitral procedures may be established by the union and the employer through their CBA.[8]  None questions that the disputes underlying this appeal are minor ones under the RLA.

Prior to filing a RLA lawsuit in federal court, employees claiming a violation of their CBA-established rights ordinarily must first exhaust the non-judicial remedies specified in their CBA.[9]  An employee may, however, bring suit without previously exhausting these remedies if (1) the union wrongfully refuses to

---

[5] Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302 (1989).

[6] Id.

[7] Id. at 303.

[8] Id.

[9] Morales v. S. Pac. Transp. Co., 894 F.2d 743, 745 (5th Cir. 1990).

10

process the employee's grievance, thereby violating its duty of fair representation; (2) the employer's conduct amounts to a repudiation of the specified contractual, remedial procedures; or (3) exhaustion of the contractual remedies would be futile.[10]

When an RLA lawsuit arising from a minor dispute is properly before us, we will only review an arbitral decision and award on one of three narrow and exclusive grounds: (1) whether the Board failed to comply with the RLA's requirements; (2) whether the Board failed to confine itself to matters within the scope of its jurisdiction; and (3) whether the Board's decision was the result of fraud or corruption.[11] We have recognized a fourth, implied ground for review: whether an award was rendered in violation of a party's due process rights.[12] Absent one of these grounds, an adjustment board's findings and orders are binding and conclusive as to the parties.[13] Thus, unless we find that an adjustment board's arbitral award is "wholly baseless and completely without

---

[10] Rabalais v. Dresser Indus., Inc., 566 F.2d 518, 519 (5th Cir. 1978).

[11] Cont'l Airlines, 391 F.3d at 617.

[12] Bhd. of Locomotive Eng'rs v. St. Louis Sw. Ry. Co., 757 F.2d 656, 661 (5th Cir. 1985).

[13] E. Airlines, Inc. v. Transp. Workers Union, 580 F.2d 169, 172 (5th Cir. 1978).

reason," we must affirm the Board's decision.[14]

B.    Merits

On appeal, the plaintiffs contend that the district court erroneously granted summary judgment in favor of Continental and IAM (collectively, "the defendants"), because (1) the plaintiffs do have standing to bring an action under the RLA; (2) the plaintiffs were unconstitutionally denied due process, as they were not provided sufficient notice, and the Board failed to maintain a record of the arbitral hearing; and (3) the Award was "wholly baseless and completely without reason."  The plaintiffs explicitly disavow any claim that the IAM breached its duty of fair representation.

In contrast, the defendants urge us to affirm the district court, because (1) Boorstein failed to exhaust the requisite arbitral remedies under the CBA; (2) all of the plaintiffs lack standing to bring an RLA action; (3) the plaintiffs' constitutional due-process rights were not violated; and (4) the Award was not "wholly baseless and completely without reason."

i.    Boorstein's Claim

On appeal, Continental argues that Boorstein's claim is not viable because of her failure to exhaust her non-judicial remedies under the CBA.  We agree.

---

[14] Id.

12

It is undisputed that Boorstein not only failed to file a grievance regarding the unfavorable adjustment of her non-competitive seniority, but, despite receiving notice of her right to do so, she failed to request review and correction of any adjustment within the thirty-day period made available to all flight attendants by the Board's award, all in derogation of the CBA. Boorstein does not offer, and our own review fails to reveal, any reason why her failure to pursue the appropriate remedies under the CBA should be excused.

In addition, the Board was not required to provide Boorstein with personal notice of the February 2002 hearing. As a flight attendant and thus a subscriber to the CBA, Boorstein had authorized the IAM to act exclusively on her behalf. Thus, as the district court correctly recognized, notice to the IAM —— Boorstein's representative —— constituted adequate notice to Boorstein and all similarly-situated employees who had not filed individual grievances.[15] We affirm the district court's dismissal of Boorstein's claims.

ii.  Mitchell's and Bale's Claims

In McNair v. United States Postal Service, we held that,

---

[15] See Bhd. of Ry., Airline, & S.S. Clerks v. St. Louis S.W. Ry. Co., 676 F.2d 132, 136 (5th Cir. 1982).

13

under the Labor Management Relations Act ("LMRA"),[16] which was

made applicable by the Postal Reorganization Act[17]:

> When a collective bargaining agreement establishes a mandatory, binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of aggrieved employees, the results obtained by the union are normally conclusive of the employees' rights under the agreement.  This means, of course, that an aggrieved worker whose employment is governed by such an agreement normally lacks standing independently . . . to attack in court the results of the grievance process. . . .
>
> These rules are not, however, without exception. It is established that, if the union has breached its duty of fair representation, by arbitrarily refusing to pursue a claim through the grievance process or by doing so in a perfunctory or otherwise inadequate manner, an aggrieved employee is not foreclosed by the results of the grievance process.  He may sue his employer or his union or both but, in order to recover, he must prove that the union breached its duty of fair representation and that the employer breached the collective bargaining agreement.[18]

As we explained in Acuff v. United Papermakers & Paperworkers,

which was decided under the National Labor Relations Act

("NLRA"),[19] this reality is necessary to effectuate the purposes

behind federal labor statutes, which require that the interests

of particular individuals be subordinated to the interests of the

---

[16]  29 U.S.C. §§ 141 et seq.

[17]  39 U.S.C. § 1209.

[18]  768 F.2d 730, 735 (5th Cir. 1985).

[19]  29 U.S.C. §§ 151 et seq.

group at the contract-negotiation stage and beyond.[20]  If an employee could compel arbitration of a grievance without his union's blessings, a CBA's contractual conflict-resolution procedures would be substantially undermined, "thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation."[21]  The same can be said of an employee's ability to seek judicial review of an arbitral award, after being abandoned by his union.[22]

Here, the plaintiffs recognize our decisions in McNair and Acuff and do not dispute their holdings, agreeing that an individual employee lacks standing to seek review of an arbitral award under the LMRA and NLRA, except that an employee may bring a claim that the union breached its duty of fair representation. Rather, the plaintiffs contend that our holdings in McNair and Acuff are limited to LMRA and NLRA claims; so they argue that they are not barred from bringing claims under the RLA.  The plaintiffs, however, offer no support or reasoning for why claims grounded in the RLA should be treated differently from claims under the LMRA or the NLRA, other than their transparent

---

[20] 404 F.2d 169, 171 (5th Cir.1969).

[21] Vaca v. Sipes, 386 U.S. 171, 191 (1967).

[22] McNair, 768 F.2d at 735.

15

acronymic differences or location within the United States Code.

Indeed, we see the plaintiffs' argument as constituting a distinction without difference. Regardless of whether a CBA is established under the LMRA, NLRA, or RLA, its existence is premised on effectuating a key purpose behind federal labor statutes, viz., placing the interests of the group ahead of the interests of the individual employees. As we have previously recognized, it would be "paradoxical in the extreme" if a union that is vested with the exclusive authority to bring an employment grievance and pursue it up to and through binding arbitration were not likewise vested with the exclusive responsibility to instigate and prosecute a review of an arbitral award in court.[23] Thus, for the same reasons articulated in McNair and Acuff, we conclude that, when a CBA formed pursuant to the RLA establishes a mandatory, binding grievance procedure and vests the union with the exclusive right to pursue claims on behalf of aggrieved employees, an aggrieved employee whose employment is governed by the CBA lacks standing to attack the results of the grievance process in court — the sole exception being the authorization of an aggrieved employee to bring an

---

[23] Acuff, 404 F.2d at 171.

16

unfair representation claim.[24]

Here, the plaintiffs expressly disavowed any claim that IAM breached its duty of fair representation. Moreover, the CBA explicitly establishes that the IAM shall represent all flight attendants in grievance procedures. Both Mitchell and Bale specifically bestowed on the IAM (and never revoked) full power of attorney to represent them at all stages of the grievance procedure. We therefore affirm the district court's conclusion that Mitchell and Bale lacked standing to petition for review of the Award.[25]

---

[24] Contra McQuestion v. N.J. Transit Rail Operations, 892 F.2d 352, 354-55 (3d Cir. 1990) (concluding that the plain language of 45 U.S.C. § 153 First (q) provides individual employees with uniquely individual grievances standing to bring in federal court a petition for review of a arbitral hearing initiated pursuant to the RLA). Unlike the underlying arbitral hearing here, which was brought by the IAM on behalf of all Continental flight attendants, the arbitration in McQuestion was "conducted solely to resolve appellants' uniquely individual grievance," such that the two plaintiffs/employees in McQuestion were the "'real parties in interest.'" Id. at 354 (quoting McQuestion v. N.J. Transit Rail Operations, No. 88-4037, slip op. at 10 (D.N.J. May 12, 1989)). We do not foreclose and need not decide today whether an individual employee may ever bring such "uniquely individual claims," rendering him the "real party in interest," such that § 153 First (q) provides him standing to bring an RLA claim. Rather, under the facts presented here and those of our precedent, an aggrieved employee will generally lack standing to bring an RLA action.

[25] As we have concluded that Boorstein failed to exhaust her CBA-created procedural remedies and that Mitchell and Bale lack standing to bring a petition for review under the RLA, we need not reach the plaintiffs' constitutional due-process claims or their contention that the Award was "wholly baseless and completely without reason."

17

## III. <u>CONCLUSION</u>

Today, we logically extend our holdings in <u>McNair</u> and <u>Acuff</u> to RLA cases, concluding that when a CBA that is formed pursuant to the RLA establishes a mandatory, binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of aggrieved employees, one whose employment is governed by the CBA lacks standing to attack the results of the grievance process in court, except only that an employee has standing to bring a claim of unfair representation. We also acknowledge and apply our precedent that requires an employee to exhaust his procedural remedies under a CBA before commencing a RLA lawsuit. Based on the applicable law and our extensive review of the parties' briefs and the record on appeal, we conclude that the district court did not commit any error. Accordingly, we affirm the summary judgment of the district court in favor of the defendants.

AFFIRMED.